IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA,

v.  Criminal No. 4:18cr95 (DJN)

TREZITH SMART,
Defendant.

**MEMORANDUM ORDER**
**(Denying Motion to Dismiss)**

This matter comes before the Court on Defendant's untimely Motion to Dismiss the Indictment (ECF No. 167), moving this Court to dismiss the Superseding Indictment against him for violation of his Sixth Amendment right to a jury drawn from a fair cross-section of the community. On October 25, 2021, the Court held the Final Pretrial Conference and heard argument on Defendant's Motion. For the reasons stated from the bench and below, Defendant's Motion (ECF No. 167) is hereby DENIED.

I.     BACKGROUND

On January 14, 2020, the Government filed a Superseding Indictment (ECF No. 41), charging Defendant with four counts: Count One, Conspiracy to Distribute and Possess with Intent to Distribute Cocaine; Counts Two and Three, Possession with Intent to Distribute and Distribution of Cocaine; and, Count Four, Possession of a Firearm During Drug Trafficking. Specifically, the Government alleges in Count One that Defendant conspired to distribute five or more kilograms of cocaine between 2013 and November 2018. Counts Two and Three charge Defendant with distributing an unspecified amount of cocaine on May 23, 2018, and August 13,

2018, respectively. Finally, Count Four charges Defendant with possessing a firearm on November 1, 2018, in furtherance of his possession with the intent to distribute cocaine.

The Court scheduled a jury trial to begin on November 2, 2021[1], with the Final Pretrial Conference to occur on October 25, 2021. (ECF No. 119.) To begin the process of selecting a jury, on August 24, 2021, the Court sent a Juror Questionnaire to 100 potential jurors randomly selected from the qualified juror wheel, with the potential jurors instructed to return the Questionnaire by September 27, 2021. (ECF No. 109.) Seventy-four potential jurors returned a completed Questionnaire. On October 18, 2021, the parties filed a Joint Motion to Strike Jurors based on the responses to the Questionnaire, identifying the jurors that they agreed should be struck for cause, the jurors that Defendant sought to strike for cause and the jurors that the Government sought to strike for cause. (ECF No. 154.) During the Final Pretrial Conference, the Court addressed those strikes for cause, ultimately granting all of the parties' requests and striking a total of 69 prospective jurors from the original panel of 100 prospective jurors. (ECF No. 168.)

Defendant filed the instant Motion to Dismiss on October 22, 2021, claiming that the seventy-four prospective jurors who returned the Questionnaire do not represent a fair cross-section of the community, because of the "substantial underrepresentation of African Americans and adults between the ages of 18-30 years old." (Mot. at 2.) Specifically, Defendant argues that "[o]ut of 74 potential jurors 7 are African American, and 7 are between the age of 18-30 years old." (Mot. at 2.) He claims that this represents "an absolute disparity of at least 20%" for the Richmond and Newport News areas." (Mot. at 1.) Based on this data, Defendant claims that

---

[1] Trial in this matter has been rescheduled several times due to Defendant changing counsel multiple times, determinations related to his mental competency to stand trial and motions that Defendant has filed.

"[i]ts obvious the jury selection process has been tampered with therefore the defendant is request a dismissal of the indictment . . . ." (Mot. at 2.)

## II.     ANALYSIS

The Sixth Amendment of the United States Constitution provides that "[i]n all criminal proceedings, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. The Supreme Court has stated that the Sixth Amendment contains a guarantee to a jury selected from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). To establish a prima facie showing of a constitutional fair cross-section violation, a defendant must prove that: "(1) a group qualifying as 'distinctive,' (2) is not fairly and reasonably represented in jury venires, and (3) 'systemic exclusion' in the jury-selection process accounts for the underrepresentation." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Defendant fails to establish a prima facie case under these elements.

### A.     African American Individuals Constitute a Distinctive Group, But 18-30 Year-Olds Do Not.

Defendant meets the first showing, but only with respect to African American individuals. "The first showing is, in most cases, easily made; the second and third are more likely to generate controversy." *Berghuis*, 559 U.S. at 319. Defendant meets this prong in that African American individuals qualify as a distinctive group. *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993) (finding African American individuals a distinctive group for a fair cross-section challenge). However, he has not met the first element with respect to the prospective jurors aged 18-30. "The U.S. Supreme Court has yet to recognize a group as 'distinctive' for fair cross-section purposes based solely upon the age of the members of the group." *Wallace v. Polk*, 2008 WL 1995297, at *31 (W.D.N.C. May 5, 2008) (collecting cases

rejecting age as a distinctive group); *see also Murphy v. Johnson*, 205 F.3d 809, 818 (5th Cir. 2000) (rejecting the argument that the defendant could make a fair cross-section claim based on the exclusion of 18-to-30-year-old individuals). Accordingly, the Court need only analyze the second and third prongs with respect to Defendant's challenge to the underrepresentation of African American individuals. In any event, Defendant's age-based claim would also fail the other two prongs for the following reasons that doom his race-based claim.

### B. Defendant Fails to Show That African American Individuals Are Not Fairly and Reasonably Represented.

Defendant fails to carry his burden with respect to the second prong for at least two reasons. First, the Fourth Circuit has held that the "use of current voter registration lists as the source for a jury pool from which random selection of jurors is made presumptively provides a fair cross-section, even if minorities are underrepresented on those lists, as long as there is no affirmative discrimination in registration." *Lewis*, 10 F.3d at 1090. The Eastern District of Virginia uses a two-step process to select jurors:

> First, a master wheel is created by transferring names of district residents from the Virginia State Board of Elections' names of registered voters, as maintained in the books, lists, or automated voter registration systems of each county and city within the district. Then, names are drawn periodically from the master jury wheel to receive juror qualification questionnaires. Individuals' answers to these questionnaires determine whether they are legally qualified to serve. If so, the names of those persons are put in a second wheel, a qualified jury wheel. As prospective jurors are needed for a petit term or grand jury, juror summonses are sent to persons randomly selected from the qualified wheel.

Public Notice, *Process by Which Names Are Periodically and Randomly Drawn for the Court's Master Wheel and for Summonsing of Grand and Petit Jurors* (Jan. 29, 2020).[2]

---

[2] A more thorough explanation of the selection and qualifications of potential jurors can be found in the *Plan for the Random Selection of Grand and Petit Jurors*, Eastern District of Virginia (Order of Chief Judge William W. Wilkins, United States Circuit Judge for the Fourth Circuit Court of Appeals, Mar. 11, 2003).

Because the Eastern District of Virginia uses the current voter registration lists as the source from which it draws a jury pool, it presumptively provides a fair cross-section of the community. Defendant has offered no evidence of affirmative discrimination in registration or any other basis for rebutting this presumption. Accordingly, he fails to meet the second prong for this reason alone.

Additionally, Defendant fails to meet the second prong for lack of statistical evidence. "Initially, the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Duren*, 439 U.S. at 668. A defendant must then show that "the disparity between the proportion of eligible whites selected for master jury wheel and proportion of eligible minority persons selected" exceeds twenty percent. *Lewis*, 10 F.3d at 1090.

Defendant has offered no such evidence as to the racial make-up of the community or how it compares to the racial make-up of the pool of jurors. Moreover, Defendant incorrectly uses the racial make-up of the seventy-four potential jurors who returned the Juror Questionnaire, rather than the 100 potential jurors to whom the Court sent a Questionnaire. These 100 potential jurors constitute the pool of prospective jurors summoned for this case from whom the Court will ultimately select a jury of twelve. The first step of selecting the jury occurred with the review of the Questionnaire responses, and the second step will occur on November 2, 2021, when the parties and the Court select twelve jurors from the remaining 31 prospective jurors. Accordingly, the statistics confined to the seventy-four potential jurors who returned the Questionnaire bear no relevance to the instant analysis, as the analysis turns on the racial composition of the group from which the Court and parties select the jury. Indeed,

Defendant cannot claim underrepresentation stemming from prospective jurors who chose not to return a Questionnaire. *Cf. United States v. Cecil*, 836 F.2d 1431, 1448 (4th Cir. 1988) ([T]here is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of a failure to register, when that right is fully open.").

The panel of 100 prospective jurors included 66 White individuals, 14 African American individuals, nine Asian individuals and 15 individuals with an unknown race. Thus, African American individuals make up *at least* 14% of the prospective jurors in this case.[3] According to data provided by the Clerk's Office, African American individuals comprise 16.29% of the qualified jurors and White individuals comprise 69.72% of the qualified jurors in the Richmond Division. Further, African American individuals comprise 17.55% and White individuals comprise 68.7% of the qualified jurors in the Eastern District of Virginia as a whole. Consequently, to the extent that the 100-person jury pool underrepresented African American individuals, it did so by less than four percent. Additionally, the pool *underrepresented* White individuals to a similar degree. Accordingly, Defendant fails to show that the disparity between the proportion of eligible White individuals selected and the proportion of eligible African American individuals selected exceeds twenty percent. Therefore, he fails to meet the second prong for lack of evidence.

### C. Defendant Fails to Show Systemic Exclusion.

Likewise, Defendant fails on the third prong. The third prong requires a defendant to show that the underrepresentation of the alleged group "was due to their systemic exclusion in

---

[3] Given the number of prospective jurors with an unknown race, it seems likely that the percentage of African American individuals exceeds 14%. However, giving Defendant the benefit of the doubt, the Court will use only the number of known African American prospective jurors.

the jury-selection process . . . that is, inherent in the particular jury selection process utilized." *Duren*, 439 U.S. at 366. In *Duren*, the defendant successfully challenged the state court's administration of a Missouri exemption permitting any woman to opt out of jury service. *Id.* at 360. The Supreme Court examined the manner in which the state court administered the exemption and the resulting statistics to determine that the "resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the *system* by which juries were selected." *Id.* at 367.

By contrast, in *Lewis*, the Fourth Circuit concluded that the defendant had not met the third prong in claiming that the voter registration rolls underrepresented African American individuals. 10 F.3d at 1090. The defendant relied on an argument that the "history of discrimination in South Carolina amounts to systemic exclusion of African-Americans from voting lists." *Id.* The Fourth Circuit rejected that idea, because he presented no "evidence of current discrimination nor evidence of impediment to any group to register to vote." *Id.*

Here, Defendant points to no such system that results in the disproportionate and consistent exclusion of African American individuals from the jury wheel or the venire. He only offers speculation that "the jury selection process has been tampered with." (Mot. at 2.) But, he does not expound on this alleged tampering or put forth any system that could have excluded African American individuals.

Finally, although Defendant does not raise this, Defendant could not successfully argue that the use of the Juror Questionnaires systemically excludes African American individuals. The Court uses the Juror Questionnaire to allow it to safely impanel a fair and impartial jury despite the challenges presented by COVID-19. The Questionnaire allows for the Court to strike qualified jurors for cause without otherwise requiring an in-person visit to the Courthouse. By

reducing the number of in-person visits to the Courthouse, the Court can implement social distancing to reduce the spread of COVID-19. Moreover, it allows the Court to eliminate prospective jurors who, fearful of contracting COVID-19 in a courtroom, may quickly vote to convict a defendant to end their jury service — rather than basing their verdict on the evidence alone. Likewise, it enables the Court to eliminate biased prospective jurors without the possibility of them influencing the rest of the jury pool. The Questionnaire serves an entirely non-discriminatory purpose and has no discriminatory effect. None of the questions exclude jurors of one particular race more than another. Defendant does not (and cannot) suggest otherwise. In sum, nothing inherent in the use of the Jury Questionnaire excludes anyone of a particular race. Accordingly, Defendant has failed to meet his burden of showing that systemic exclusion accounts for underrepresentation of African American individuals on the jury.

### III.   CONCLUSION

Defendant has failed to make a prima facie case for a Sixth Amendment violation, because he has not shown that African American individuals lack fair and reasonable representation in jury venires, or that any such underrepresentation stems from systemic exclusion. Accordingly, Defendant's cross-section challenge under the Sixth Amendment fails and his Motion to Dismiss (ECF No. 167) is hereby DENIED.

Let the Clerk file a copy of this Memorandum Order electronically, notify all counsel of record and send a copy to Defendant at his address of record.

It is so ORDERED.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Date: October 28, 2021