IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA,

v.  Criminal No. 4:18cr95 (DJN)

TREZITH RASHAD SMART,
Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Trezith Rashad Smart's ("Defendant") Motions to Suppress (ECF Nos. 108, 116), moving the Court to suppress all evidence obtained by police as a result of two distinct traffic stops. For the reasons set forth below and stated from the bench, Defendant's Motions are DENIED.[1]

### I.  BACKGROUND

#### A.  Relevant Procedural History

On January 14, 2020, the Government filed a Superseding Indictment (ECF No. 41), charging Defendant with four counts: Count One, Conspiracy to Distribute and Possess with Intent to Distribute Cocaine; Counts Two and Three, Possession with Intent to Distribute and Distribution of Cocaine; and, Count Four, Possession of a Firearm During Drug Trafficking. Specifically, the Government alleges in Count One that Defendant conspired to distribute five or more kilograms of cocaine between 2013 and November 2018. Counts Two and Three charge Defendant with distributing an unspecified amount of cocaine on May 23, 2018, and August 13,

---

[1]  On October 29, 2021, the Court entered an Order (ECF No. 179) denying Defendant's Motions to Suppress. This Memorandum Opinion explains the basis for that Order.

2018, respectively. Finally, Count Four charges Defendant with possessing a firearm on November 1, 2018, in furtherance of his possession with the intent to distribute cocaine.

On August 23, 2021, through his court-appointed attorney, Defendant filed his Motion to Suppress Evidence ("First Suppr. Mot." (ECF No. 108)), seeking to suppress the evidence that the police obtained as a result of a traffic stop on November 1, 2018. On September 13, 2021, the Government filed its Response in Opposition to Defendant's Motion to Suppress Evidence ("Govt's First. Resp." (ECF No. 113)). On September 14, 2021, Defendant sent a letter directly to the Court, requesting that the Court allow him to represent himself and allow him to file a separate Motion to Suppress ("Second Suppr. Mot." (ECF No. 116)), moving to suppress the evidence against him obtained as a result of a traffic stop on March 15, 2017. Although Defendant filed his Second Suppression Motion after the Court's deadline for filing pretrial motions, the Court allowed his untimely motion and ordered the Government to respond. (ECF No. 114.) On September 17, 2021, the Government filed its Response in Opposition to Defendant's Motion to Suppress Evidence ("Govt's Second Resp." (ECF No. 120)). On October 1, 2021, Defendant elected to exercise his right to proceed pro se under *Faretta v. California*, 422 U.S. 806 (1975). (ECF No. 135.) However, during the hearing on his Motion to Proceed Pro Se, Defendant stated that he still wished to proceed with the First Suppression Motion filed by his court-appointed counsel.

On October 25, 2021, the Court held an evidentiary hearing on Defendant's Motions, hearing testimony from Trooper Shane Tilford of the Louisiana State Police, Officer Michael Heath Miller of the Virginia State Police, Special Agent Brad Smith of the Drug Enforcement Administration ("DEA") and Defendant himself. (ECF No. 169; (Tr. of Oct. 1, 2021 Hr'g ("Tr.") (ECF No. 185)).) The Court found Trooper Tilford, Officer Miller and Agent Smith

credible. (Tr. 89: 16-17; 186:10-11.) The Court found Defendant not credible to the extent that his testimony conflicted with that of the law enforcement agents. (Tr. 89:17.) Following the presentation of evidence, the Court heard argument on the Motions. (Tr. 88-89, 183-86.) At the conclusion of argument, the Court denied Defendant's Motions. (Tr. 186.) The reasons for denial follow.

### B. Relevant Background Facts

#### i. The March 15, 2017 Traffic Stop

On March 15, 2017, Trooper Shane Tilford of the Louisiana State Police Department pulled over Defendant's vehicle after Trooper Tilford's radar detected Defendant driving at a speed of eighty-two miles per hour in a seventy miles per hour zone. (Tr. 14:19-21.) Defendant admitted that he had been speeding. (Tr. 18:17-18.) As Trooper Tilford questioned Defendant, Defendant exhibited excessive nervousness, stared at the windshield and required long pauses in his sentences. (Tr. 20:7-21:1.) Defendant made inconsistent statements regarding his travel plans, as Defendant even later admitted. (Tr. 84:9-11.) Trooper Tilford also observed gas cans in the vehicle, which drug traffickers will often utilize to avoid extra stops. (Tr. 19:8-20.) Defendant was under the influence of cocaine at the time of the stop, as he admitted during the hearing. (Tr. 72:2-11.)

Based on Defendant's extreme nervousness and inconsistent travel itinerary, Trooper Tilford suspected possible criminal activity and requested consent to search Defendant's vehicle, but Defendant refused. (Tr. 22:11-16.) Trooper Tilford then deployed his narcotics-detection dog, Rex, to conduct a "free air sniff" of the outside of Defendant's vehicle. (Tr. 23:1-3.) Rex gave a positive alert to a trained narcotic odor at both the passenger and rear doors of the vehicle. (Tr. 58:13-14.) Following a struggle that resulted in the troopers tasing Defendant, the troopers

3

subdued Defendant and searched his vehicle, finding over five kilograms of cocaine.[2] (Tr. 23:21-24:4; 80:24-81:5.)

### ii. *The November 1, 2018 Traffic Stop*

On November 1, 2018, Virginia State Police Officer Heath Miller initiated a traffic stop, at the request of the DEA, of Defendant's vehicle for a driving violation in Suffolk, Virginia. (Tr. 96:3-4; 98:12-15.) During the stop, Officer Miller smelled marijuana as he approached Defendant's car. (Tr. 98:13-15.) Officer Miller searched Defendant's car and found no contraband. (Tr. 106:3-8.) Thereafter, Officer Miller transported Defendant to a parking lot about a half of a mile away, where Agent Smith and other DEA agents awaited them. (Tr. 108:5-9.)

Following his arrest, law enforcement agents read Defendant his *Miranda* rights and explained their ongoing investigation into Defendant's narcotics activities. (Tr. 126:2-9.) Defendant provided his consent for the DEA to search his property in Newport News. (Tr. 126:15-16.) Defendant gave numerous inculpatory statements that day and in the days following, including the details of his narcotics distribution and the identification of several co-conspirators. (Tr. 130:15-20.) Defendant spoke with Agent Smith on his own volition several times in the following days to provide more statements regarding the narcotics distribution operation. (Tr. 132:4-133:25.)

### C. Defendant's Motions

Defendant has filed Motions to Suppress the evidence obtained during both of these traffic stops. With respect to the March 15, 2017 traffic stop, Defendant denies breaking the speed limit. (Second Suppr. Mot. at 1-2.) Additionally, Defendant argues that Trooper Tilford

---

[2] The suspected cocaine was later field tested and found to contain the presence of cocaine that weighed 5.6 kilograms.

4

lacked reasonable suspicion to initiate the dog sniff. (Second Suppr. Mot. at 4.) Moreover, Defendant argues that the narcotics dog did not actually alert on the car, but that Trooper Tilford nevertheless searched the vehicle. (Second Suppr. Mot. at 2.) Consequently, Defendant asks the Court to suppress any statements or evidence obtained following the detention. (Second Suppr. Mot. at 5.)

With respect to the November 1, 2018 traffic stop, Defendant argues that the initial stop lacked any justification, as he was not committing a traffic infraction at the time. (First Suppr. Mot. at 2-3.) Defendant further argues that the subsequent detention constituted a warrantless arrest without basis. (First Suppr. Mot. at 3-4.) Therefore, Defendant asks the Court to suppress "any statements, consents, or seizures made following this unlawful detention." (First Suppr. Mot. at 4.)

## II.   ANALYSIS

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The safeguard of this right comes in the form of the exclusionary rule, which dictates that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). As the Supreme Court has made clear, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). When law enforcement officials undertake a search or seizure to discover evidence of criminal wrongdoing, "reasonableness generally requires the obtaining of a judicial warrant." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). If the officials do not obtain a

5

warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). Here, law enforcement officials did not obtain a warrant before either traffic stop to arrest Defendant or search his car or person. Consequently, Defendant claims that the searches and seizures violated his Fourth Amendment rights. The Court will examine each traffic stop in turn.

### A. The March 15, 2017 Traffic Stop Did Not Violate Defendant's Fourth Amendment Rights.

Defendant argues that the Court should suppress evidence obtained from the March 15, 2017 traffic stop, because law enforcement had no valid reason to stop his vehicle or conduct a dog sniff of the exterior of his vehicle. The Government contends that Trooper Tilford had a valid basis to stop Defendant's vehicle, reasonable suspicion to prolong the stop for a dog sniff and probable cause to search the vehicle and seize Defendant. The Court will examine each step and the facts supporting the Government's basis for taking each step.

#### i. *The Initial Traffic Stop Was Justified.*

First, Trooper Tilford stopped Defendant's vehicle due to excessive speed. "Under well-established doctrine, a police officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop — known as a *Terry* stop — predicated on reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1969)). Courts analyze traffic stops as *Terry* stops. *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). Thus, courts ask "(1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." *Id.* The reasonable suspicion for the stop need not rise to the level of probable cause but "requires at least a minimal level of objective justification for making the stop." *Id.* Courts evaluate the validity of a *Terry* stop

6

using "the totality of the circumstances — the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996)). Here, Trooper Tilford testified that he utilized the front antenna of his in-car radar and identified that Defendant had been traveling eighty-two miles per hour. (Tr. 14:19-21.) The Court finds Trooper Tilford's testimony credible and, therefore, finds as a matter of fact that Defendant traveled eighty-two miles per hour on the day in question. This exceeded the posted speed limit of seventy miles per hour, in violation of La. Rev. Stat. Ann. § 32:61 (2017). Thus, Trooper Tilford had probable cause to believe that Defendant committed a traffic violation, supplying sufficient justification for temporarily seizing Defendant to investigate the traffic violation. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("A seizure for a traffic violation justifies a police investigation of that violation."). Consequently, Defendant's argument that the initial stop lacked justification fails.

However, "a seizure that is lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes on rights protected by the Fourth Amendment." *Bowman*, 884 U.S. at 209. Because Defendant also argues that Trooper Tilford infringed upon his Fourth Amendment Rights by employing the dog sniff, the Court will next examine whether Trooper Tilford unreasonably executed the traffic stop by conducting the dog sniff.

    *ii.*  ***Reasonable Suspicion Supported the Dog Sniff.***

With respect to searches and seizures that occur during a traffic stop, courts again analyze routine traffic stops under the same framework as a *Terry* stop. *Rodriguez*, 575 U.S. at 354.

Thus, "the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (internal citations omitted). "A canine sniff is also constitutionally acceptable if performed within the 'time reasonably required' to issue a traffic citation." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). A canine sniff itself cannot violate the Constitution, because it does not constitute a search within the meaning of the Fourth Amendment and, consequently, requires no additional justification. *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005). However, a canine sniff lacks a lawful basis if it prolongs the traffic stop, even if only for a *de minimis* amount of time, absent independent justification to prolong the stop. *Rodriguez*, 575 U.S. at 357. Here, the canine sniff extended the stop, as Trooper Tilford testified that he reengaged Defendant after he had run Defendant's paperwork. (Tr. 21:23-22:3.)

Because the canine sniff prolonged the traffic stop, the Court must determine whether a lawful basis existed to extend the stop. "If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent." *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011). Here, Defendant did not consent, so the propriety of extending Defendant's detention beyond the time necessary to complete the traffic stop turns on whether reasonable suspicion existed when Trooper Tilford decided to conduct the dog sniff on Defendant's vehicle.

When making reasonable-suspicion determinations, courts look at the "totality of the circumstances" to determine whether the officer had a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An officer's mere hunch will not suffice, but the likelihood of criminal activity "need not rise to the level

8

required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274. As such, "the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. However, individual facts that may have an innocent explanation on their own "may together amount to reasonable suspicion" if the officer views the totality of the facts as suspicious activity. *Mitchell*, 963 F.3d at 390; *Sokolow*, 490 U.S. at 9 (holding that factors that by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).

Moreover, the determination of reasonable suspicion does not occur in a vacuum. Rather, it "must give due weight to 'commonsense judgments and inferences about human behavior made by officers in light of their experience and training.'" *Mitchell*, 963 F.3d at 390 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). "The standard depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020). Therefore, although the standard requires more than an officer's hunch or unparticularized suspicion, courts "credit the practical experience of officers who observe on a daily basis what transpires on the street." *Mitchell*, 963 F.3d at 390 (internal quotations omitted).

Here, viewing the facts in their totality, the Court finds it reasonable that Trooper Tilford suspected illegal activity. Trooper Tilford testified that Defendant admitted that he had been speeding. (Tr. 18:17-18.) As Trooper Tilford questioned Defendant, Defendant exhibited excessive nervousness, engaged in "clunky" conversation, stared at the windshield and required long pauses in his sentences. (Tr. 20:7-21:1.) Defendant behaved in a manner that led Trooper Tilford to believe that Defendant might flee. (Tr. 20:22-23.) Defendant made inconsistent

statements regarding his travel plans, as Defendant even later admitted. (Tr. 84:9-11.) Trooper Tilford also observed gas cans in the vehicle, which drug traffickers often will utilize to avoid extra stops. (Tr. 19:8-20.) Indeed, during the hearing, Defendant testified that he actually was under the influence of cocaine at the time of the stop. (Tr. 72:2-11.) Based on Defendant's extreme nervousness, inconsistent travel itinerary and general demeanor, Trooper Tilford suspected possible criminal activity. (Tr. 54:17-23.)

The Supreme Court has stated that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. Likewise, the Fourth Circuit has considered a detainee's extreme nervousness important in finding the existence of reasonable suspicion. *See, e.g., Branch*, 537 F.3d at 338 (finding officer's suspicions reasonable based in part on the defendant's hands shaking during the stop); *United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (relying in part on the defendant's nervousness in finding reasonable suspicion). Although the Fourth Circuit has, at times, discounted signs of nervousness in the reasonable suspicion analysis, this discount applies to normal nerves inherent in a citizen-police encounter. *See, e.g., United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011) ("Thus, absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion."). In this instance, however, Defendant exhibited signs of *excessive* nervousness "beyond the norm," with Trooper Tilford testifying that he specifically attempted to discern whether Defendant's nerves went beyond the normal fear of a citizen-police encounter. (Tr. 20:2-13.) Combined with the gas cans and Defendant's conflicting reports of his travel itinerary, the Court finds it objectively reasonable that Trooper Tilford suspected criminal activity. *See United States v. Carpenter*, 462 F.3d 981, 986-87 (8th Cir. 2006) (finding reasonable suspicion for a dog sniff based on implausible travel

plans and nervous conduct). Accordingly, Trooper Tilford did not infringe on Defendant's Fourth Amendment rights in prolonging the traffic stop to deploy the narcotics dog.

### iii. *Probable Cause Supported the Vehicle Search.*

Defendant further appears to argue that the search of his car that turned up the cocaine violated his Fourth Amendment rights. The Government argues that the positive response from the dog created probable cause of criminal activity to warrant a search of the vehicle. The Court agrees with the Government.

If an officer "has probable cause to believe that a search of the vehicle would uncover contraband, he may search the vehicle." *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012); *Ornelas v. United States*, 517 U.S. 690, 693 (1996) ("[A] warrantless search of a car is valid if based on probable cause."). The probable cause standard calls for "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown," the presence of illegal activity. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "Stripped to its essence, the question to be answered is whether an objectively reasonable police officer, placed in the circumstances, had a reasonable ground for belief of guilt that was particularized with respect to the person to be searched or seized." *United States v. Humphries*, 372 F.3d 653, 657-58 (4th Cir. 2004).

In this instance, the Court has no trouble finding that Trooper Tilford had probable cause to search the vehicle. A positive alert from a narcotics dog — with no reason to doubt the dog's reliability — provides probable cause to search a vehicle for contraband. *Florida v. Harris*, 568 U.S. 237, 250 (2013). Here, the narcotics dog gave a positive response to a trained narcotic odor at the passenger side door and rear of the vehicle. Although Defendant claims that the "dog walked around the car making no reaction at all" (Second Suppr. Mot. at 4), Trooper Tilford

testified that the dog made two positive reactions — as confirmed by the dashcam video — and Trooper Tilford articulated how he knew that the dog had made a positive reaction. (Tr. 23:5; 58:13-14; Govt's Ex. 3.)

Trooper Tilford further testified to the training and certification that the dog had received. (Tr. 10:22-11:19.) Defendant has not argued that the dog in question lacks proper training or otherwise lacks reliability. Nor has Defendant produced any conflicting evidence to discount the dog's reliability. Accordingly, the dog's alert provided Trooper Tilford with probable cause to search the car.

Additionally, Defendant's actions following the dog alert bolstered Trooper Tilford's probable cause. After learning of the positive alert, Defendant attempted to flee and then resisted arrest, ultimately leading to the officers tasing him. (Tr. 80:24-81:5.) As the Supreme Court has stated, "[h]eadlong flight," although "not necessarily indicative of wrongdoing," "is certainly suggestive of such." *Wardlow*, 528 U.S. at 124. The positive dog alert, Defendant's flight and Defendant's struggle, combined with the previously discussed facts that gave rise to the reasonable suspicion, support a determination that a reasonable officer would believe that Defendant had contraband in his car. Accordingly, the search of Defendant's vehicle did not violate his Fourth Amendment rights. Therefore, the Court will not suppress any evidence obtained from the search on March 15, 2017.

**B. The November 1, 2018 Traffic Stop Did Not Violate Defendant's Fourth Amendment Rights.**

Defendant also argues that the Court should suppress the evidence obtained as a result of the traffic stop in Suffolk, Virginia, on November 1, 2018. Specifically, Defendant contends that the initial stop lacked any justification and the subsequent detention and questioning likewise lacked any lawful basis. As a result, the Court should suppress any statements that Defendant

12

made following the illegal search and seizure. The Government responds that Agent Smith had probable cause to arrest Defendant and that Officer Miller stopped Defendant's vehicle for a speeding violation and then smelled marijuana emanating from the car, leading to his lawful detention and questioning. Once again, the Court agrees with the Government.

First, Officer Miller had probable cause to stop and detain Defendant based on the probable cause known to Agent Smith, as dictated by the collective knowledge doctrine. The collective knowledge doctrine "holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself." *United States v. Massenberg*, 654 F.3d 480, 492 (4th Cir. 2011). The Supreme Court recognized this doctrine in *Whiteley v. Warden*, where it stated that "officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid" had probable cause to support the arrest. 401 U.S. 560, 568 (1971). The Supreme Court further applied this principle in *United States v. Hensley*, stating that an officer who stops a defendant "in objective reliance" on a flyer from another department is justified only if the officers who issued the flyer had reasonable, particularized suspicion to justify their own stop:

> We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop . . . . If the flyer has been issued in the absence of a reasonable suspicion, then a stop on objective reliance upon it violates the Fourth Amendment.

469 U.S. 221, 232 (1985).

The Fourth Circuit has stated that "so long as the officer who orders an arrest or search has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest or conducting the search to be personally aware of those facts." *United States v. Laughman*, 618 F.2d 1067, 1072-73. (4th Cir. 1980). As such, courts examine the knowledge

13

of the directing officer, even if the arresting officer lacked the details of that knowledge. *Id.* at 1073 n.3; *see also United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996) ("[A]lthough the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that Wells was a convicted felon, it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of seizure."). However, the collective knowledge doctrine does not permit courts "to aggregate bits and pieces of information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions." *Massenburg*, 654 F.3d at 493. Instead, it simply directs courts "to substitute the knowledge of the *instructing officers* for the knowledge of the *acting officer*." *Id.*

Thus, under the collective knowledge doctrine, the Court will substitute the knowledge of Agent Smith for the knowledge of Officer Miller. Such a substitution justifies Officer Miller's actions, as Agent Smith had probable cause to believe that Defendant had engaged in a conspiracy to distribute narcotics. First, Agent Smith testified that he had received information that Defendant acted as the source of supply of narcotics for Defendant's cousin, who brokered narcotics transactions in Hampton and Newport News. (Tr. 114:5-14.) In May of 2018, Agent Smith then conducted a controlled buy through a confidential informant, who purchased narcotics from Defendant and his cousin, Harold Jones. (Tr. 114:15-115:2; 119:15.) Agent Smith established surveillance of Defendant and observed him picking up Jones and the two of them conducting narcotics transactions. (Tr. 115:3-6.) From the conversations with Harold, Agent Smith understood that the narcotics came from Defendant. (Tr. 138:25-139:2.)

Moreover, Agent Smith had, during the course of his investigation of Defendant, learned of the above-discussed March 15, 2017 traffic stop in Louisiana wherein officers found over five

14

kilograms of cocaine in Defendant's vehicle, which corroborated other information that Agent Smith had learned during the investigation. (Tr. 116:2-117:4.) Agent Smith confirmed that the cocaine found during the Louisiana stop had been destined for distribution in the Peninsula and even identified the house from which Defendant had received the narcotics. (Tr. 121:21-24; 137:5-8.)

Further, Agent Smith had knowledge of another stop of Defendant that uncovered evidence of a possible drug conspiracy. In August of 2018, Newport News narcotics detectives pulled over Defendant. (Tr. 119:19-25.) The detectives found approximately an ounce of cocaine and approximately $15,000 in Defendant's vehicle. (Tr. 120:13-22.)

Additionally, Agent Smith had obtained court-ordered authorization to monitor Defendant's movements, resulting in DEA agents placing court-authorized tracking devices on Defendant's vehicles. (Tr. 117:7-16.) From the surveillance, the agents learned of a pattern of travel for Defendant, wherein he would drive from his residence in Newport News to the eastern part of North Carolina. (Tr. 117:17-19.) Defendant would then take short trips out and about the community from a house that he maintained there, before returning to Newport News. (Tr. 117:19-22.) These trips included short, out-and-back trips to different parking lots. (Tr. 120:9-12.) Agent Smith had also conducted trash-pull surveillances of Defendant, recovering remnants of cocaine trafficking. (Tr. 121:24-122:1; 137:11-12.)

The above facts amount to ample probable cause to arrest Defendant for narcotics distribution. Law enforcement agents had twice stopped Defendant and found evidence of drug trafficking in his vehicle. They had conducted controlled buys of narcotics from Defendant and had surveillance of Defendant that demonstrated a pattern associated with narcotics distribution. Defendant's trash revealed evidence of cocaine trafficking. Thus, Agent Smith had probable

15

cause to arrest Defendant. And, Agent Smith informed Officer Miller that he had probable cause to arrest Defendant. Officer Miller relied on that information in detaining Defendant following his own traffic stop. Therefore, based on the collective knowledge doctrine, Officer Miller also had probable cause to arrest Defendant.

Even absent the collective knowledge doctrine, Officer Miller had probable cause to search Defendant's car and detain Defendant during that search. Officer Miller had sufficient justification to stop Defendant's vehicle. As discussed above, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810; *see Rodriguez*, 575 U.S. at 354 ("A seizure for a traffic violation justifies a police investigation of that violation."). Officer Miller testified that he observed Defendant following too closely and driving with an obstructed view. (Tr. 98:12-13.) Officer Miller further testified that he could have, and likely would have, stopped Defendant's vehicle for these violations alone. (Tr. 100:23-102:25.) Accordingly, Defendant's traffic violations warranted Officer Miller's initial seizure of Defendant.

Second, Officer Miller had probable cause to detain Defendant longer than necessary to effectuate the traffic stop. "If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent." *Digiovanni*, 650 F.3d at 507. Moreover, if an officer "has probable cause to believe that a search of the vehicle would uncover contraband, he may search the vehicle." *Ortiz*, 669 F.3d at 444; *Ornelas v. United States*, 517 U.S. at 693 ("[A] warrantless search of a car is valid if based on probable cause."). Of course, if the officer "has probable cause to believe that the suspect has committed a crime, he may arrest him." *Ortiz*, 669 F.3d at 444.

Here, the odor of marijuana provided the probable cause necessary to search the vehicle and detain Defendant. The Fourth Circuit has "repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020). Further, "if an officer smells the odor of marijuana in circumstances where the officer can localize its source to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana." *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004). Officer Miller testified that, upon approaching the vehicle, he smelled marijuana emanating from the vehicle. (Tr. 98:12-15.) Based on the smell of marijuana, Officer Miller had probable cause to believe that a search of Defendant's vehicle would uncover contraband. Thus, he had probable cause to search the vehicle. Likewise, he had probable cause to believe that Defendant had committed or was committing the crime of possession of marijuana.[3] Although this did not give Officer Miller the authority to detain Defendant beyond the time needed to conduct the search, it gave Officer Miller independent justification for the initial stop and search. In detaining Defendant further and transporting him to the DEA agents, Officer Miller could properly rely on the ample probable cause developed by Agent Smith, but not on his own observations at that time.

Following his arrest, law enforcement agents read Defendant his *Miranda* rights and explained their ongoing investigation into Defendant's narcotics activities. (Tr. 126:2-9.) Defendant provided his consent for the DEA to search his property in Newport News. (Tr. 126:15-16.) Defendant gave numerous inculpatory statements that day and the days following, including the details of his narcotics distribution and the identification of several co-conspirators.

---

[3] The arrest occurred before July 1, 2021, the date that the Commonwealth of Virginia decriminalized the possession of marijuana. Va. Code Ann. § 4.1-1100. Therefore, at the time of the stop, Virginia still outlawed the possession of marijuana, and probable cause to believe that someone possessed marijuana justified the arrest of that person.

(Tr. 130:15-20.) Defendant spoke with Agent Smith on his own volition several times in the following days to provide more statements regarding the narcotics distribution operation. (Tr. 132:4-133:25.) Defendant claims that the illegal search and seizure warrant suppression of these statements as "fruit of the poisonous tree." But, because the Court finds that the officers did not violate Defendant's Fourth Amendment rights, the fruit of the poisonous tree doctrine does not apply here. Resultingly, Defendant's Motion to Suppress the statements following the November 1, 2018 traffic stop will be denied.

### III. CONCLUSION

In sum, Defendant suffered no Fourth Amendment violations, especially no violations that would warrant suppression of the narcotics found in his vehicle or the statements that he made to law enforcement. For each of the challenged traffic stops, the officer justifiably pulled over Defendant and subsequently searched Defendant's car and arrested him based on valid probable cause. Therefore, the officers did not violate Defendant's Fourth Amendment rights at any point in either encounter. Accordingly, Defendant's Motions to Suppress (ECF Nos. 108, 116) will be DENIED.

Let the Clerk file a copy of this Memorandum Opinion electronically, notify all counsel of record and send a copy to Defendant at his address of record.

It is so ORDERED.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Date: November 2, 2021